## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

PATRICIA WHITE,

                Plaintiff,

vs.                                CASE NO: 2:05-cv-329-FtM-29SPC

JO ANNE BARNHART,

                Defendant.

_____

### REPORT AND RECOMMENDATION[1]

This matter comes before the Court on the Plaintiff Patricia White's Complaint Seeking Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the Plaintiff's Claim for Disability Insurance (Doc. # 1) filed on July 12, 2006. The Plaintiff filed her Memorandum of Law in Support of the Complaint (Doc. #11) on February 21, 2006. The Commissioner filed her Memorandum of Law in Support of the Commissioner's Decision (Doc. #14) on April 21, 2006. Thus, the Motion is now ripe for review.

The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

---

[1]This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 28 U.S.C. § 405(g).

# FACTS

## *Procedural History*

The Plaintiff filed an application for Social Security Disability Benefits (SSDI) on March 6, 2002, alleging an onset disability date of April 12, 1999. (Tr. 50.) The Plaintiff's application was denied initially and upon reconsideration. (Tr. 33-39.) The Plaintiff timely filed a request for hearing and a hearing was held before the Honorable Ann S. Azdell, Administrative Law Judge (ALJ), on June 8, 2004. (Tr. 12-24.) The ALJ issued an unfavorable decision on August 20, 2004, finding that the Plaintiff was not disabled prior to the date last insured, December 30, 2000. (Tr. 23.) The Plaintiff filed a request for review by the Appeals Council. (Tr. 9.) The Appeals Council denied the Plaintiff's request for review on May 13, 2005. (Tr. 5-9.) Having exhausted all administrative remedies, the Plaintiff timely filed a Complaint with this Court.

## *Plaintiff's History*

The Plaintiff was born on April 1, 1969, and was thirty-one (31) years of age on the date she was last insured for benefits. (Tr. 12.) The Plaintiff was thirty-five (35) years of age at the time of the hearing. (Tr. 13.) The Plaintiff has a twelfth grade education and past relevant work experience as a police dispatcher and secretary. (Tr. 22.)

## *Medical and Psychological History*

On or about April 17, 1998, the Plaintiff was injured in an automobile accident. (Tr. 309-31.) She was diagnosed with a cervical sprain. (Tr. 309.) Two weeks later, on August 31, 1998, the Plaintiff presented to Naples Community Hospital emergency room complaining of weakness, feeling clammy, as well as nausea and lightheadedness. (Tr. 290.) She was diagnosed with acute

2

stress/anxiety reaction and was started on Paxil.  (Tr. 290.)

On September 9, 1998, the Plaintiff presented to Dr. J.P. Van Dongen for an evaluation for stress and anxiety. (Tr. 148.)  The Plaintiff complained of feeling somewhat lightheaded and weak related to stress.  (Tr. 148.)  The examination revealed she was alert and healthy-looking.  (Tr. 148.)  The Plaintiff was found to be an essentially healthy lady with stress/anxiety reaction causing lightheadedness, weakness and anemia.  (Tr. 148.)  She was prescribed a trial of Prozac.  (Tr. 148.)

On March 24, 1999, the Plaintiff presented to the Naples Community Hospital emergency room after passing out while working at the police station. (Tr. 251-267.)  Before she passed out, she described diaphoresis[2] and lightheadedness.  An EKG was conducted and was normal.  (Tr. 254.)  A CBC and Chem 7 test was also normal.  (Tr. 254.)  The Pregnancy test, chest x-ray and portable C-spine tests were negative. (Tr. 254.)  The Plaintiff was diagnosed with syncopal[3] episode and lumbar strain.  (Tr. 254.)

Two weeks later, on April 8, 1999, the Plaintiff presented to Dr. Van Dongen as follow-up to experiencing a  fainting spell while driving. (Tr. 145.)  The Plaintiff described being under a lot of stress looking for babysitters, her job, and social and financial situations.  (Tr. 145.)   The Plaintiff had discontinued her Prozac.  (Tr. 145.)  Dr. Van Dongen diagnosed her with a syncopal episode, probably related to an anxiety element, and prescribed Paxil and Xanax.  (Tr. 145.)

The Plaintiff presented to Dr. John Lewis, M.D., at the Naples Community Hospital emergency room on April 10, 1999, complaining that she had another syncopal episode. (Tr. 231-

---

[2]Diaphoresis is profuse sweating.  F.A. Davis, Taber's Cyclopedic Medical Dictionary, 561 (19th ed. 2001). (Taber's)

[3]Syncopal is defined as a transient and usually sudden loss of consciousness, accompanied by an inability to maintain an upright position. Taber's at 2020.

250.)  The Plaintiff reported some upper neck pain that went into her back.  She suffered a syncopal episode and was also witnessed to have a seizure by bystanders.  She was amnestic[4] to the seizure. Dr. Lewis, with consultation with Dr. Bercaw,  recommended that she be admitted for further care and with treatment indication that a seizure needed to be very strongly considered. (Tr. 233-234.)

On the same day,  Dr. Beauregard L. Bercaw also examined the Plaintiff at the request of Dr. Lewis. (Tr. 236-237.)  The Plaintiff reported having blackout spells since the age of fourteen varying in frequency.  Dr. Bercaw's impression was seizure disorder, probable complex/partial seizures with secondary generalization. (Tr. 236.)  Dr. Bercaw prescribed Dilantin.  (Tr. 236.)  The Plaintiff  was instructed not to drive until she had been seizure-free or spell-free for at least six months.(Tr. 236.)

On April 12, 1999, the Plaintiff presented to Dr. Van Dongen complaining of experiencing two seizures, with shaking and chest pain. (Tr. 140.)  She stated she felt very tearful,  was sleeping a lot, and could not concentrate on anything. (Tr. 140.)  Upon examination, Dr. Van Dongen opined that the Plaintiff looked very healthy and her affect was quite appropriate.  The Plaintiff requested a work excuse for the week due to experiencing a lot of stress and tension.  (Tr. 140.)  Dr. Van Dongen diagnosed the Plaintiff with anxiety disorder. (Tr. 140.)

On April 15, 1999, the Plaintiff was treated by Germaine Eurich, a nurse practitioner, and Dr. John Campbell of Collier Neurologic Specialists.  (Tr. 357-361.)  The Plaintiff complained of an increase in seizures in the last four to six weeks.  (Tr. 358.)  She reported having been put on Dilantin 300mg at the emergency room but was only taking 200 mg and reported  having an episode as recently as the previous day.  (Tr. 358.)  The Plaintiff also complained of being chronically fatigued, nervous, and anxious.  (Tr. 358.)  She was diagnosed with seizure disorder, was instructed to increase

---

[4]Amnestic refers to loss of memory. Taber's at 87.

4

her Dilantin, and to refrain from driving. (Tr. 358.)

On July 6, 1999, the Plaintiff returned to Collier Neurologic Specialists and reported having one seizure per week. (Tr. 357.) She was also taking Neurontin along with her Dilantin. She had chest pain every other day and was instructed to follow-up with Dr. Van Dongen. (Tr. 357.)

Nurse Practitioner Eurich completed a disability statement on July 6, 1999. (Tr. 360-361.) She opined that prolonged activity could cause fatigue and lower the Plaintiff's seizure threshold. (Tr. 361.) It was further opined that the Plaintiff was unable to drive per Florida law, however, the Plaintiff had essentially good functioning in all areas. (Tr. 361.) Nurse Practitioner Eurich opined that the Plaintiff became unable to work on April 10, 1999.

On August 16, 1999, the Plaintiff presented to Dr. Steven West at the Naples Community Hospital for a possible seizure at work. (Tr. 223-230.) The Plaintiff had been brought into the emergency room by ambulance. (Tr. 223.) She was found at work underneath her desk confused and somewhat paranoid. (Tr. 223.) Emergency Medical Services workers felt that the Plaintiff was postictal[5] so she was transported for evaluation. (Tr. 223.) Dr. West diagnosed the Plaintiff with a seizure with sub-therapeutic Dilantin level. (Tr. 224.)

Between the dates of September and December 1999, Dr. Campbell, a neurologist, examined the Plaintiff for seizures. (Tr. 353-356.) The Plaintiff stated she felt like she was on a roller coaster and that the sensation was increasing in intensity as well as frequency. She felt the same sensation a few times a week and had no precipitating activities or causes. She complained she had anxiety attacks with chest pressure. (Tr. 355-356.) Over the following two months, the Plaintiff complained

---

[5]Postictal is that which occurs after a sudden attack or stroke, as an epileptic seizure or apoplexy. Taber's at 1646.

about ongoing episodes.

On October 21, 1999, the Plaintiff stated since her last visit, three weeks earlier, she had three additional episodes. (Tr. 354.) The physical examination revealed no nystagmus[6], no incoordination, no speech problems or gait problems. (Tr. 354.)  On December 3, 1999, Nurse Practioner Eurich dictated a letter stating that the Plaintiff was under her care for a neurological condition due to occasional seizures. She was unable to drive and her daughter needed to be placed in daycare. (Tr. 353.)

On January 31, 2000, Dr. Robert Mulert examined the Plaintiff in the emergency room at Naples Community Hospital complaining of experiencing another seizure. (Tr. 218-221.)  The Plaintiff's husband explained that his wife's hands were shaking, she had a seizure, and then she fell onto the garbage can cover. (Tr. 219.)  After she fell, she started trembling again and passed out. (Tr. 219.)  Her husband stated her eyes rolled back and she was not responsive until the EMS came and they put a piece of ammonia underneath her nose. Physical examination was normocephalic and atraumatic. (Tr. 219.)  There was no nystagmus and the oral cavity was negative for bite marks. (Tr. 219.)  The lungs were clear and heart rate was regular and normal without murmurs. (Tr. 220.)  Neurologically, the Plaintiff had negative straight leg raise bilaterally, reflexes were symmetric bilaterally, and motor strength was 5/5. (Tr. 220.)  She was diagnosed with seizure and a lumbar contusion. (Tr. 219.)

The Plaintiff continued to suffer from seizures over the following few months and she was treated by Dr. Campbell. (Tr. 339, 349-351.)  On February 24, 2000, the Plaintiff reported having

---

[6]Nystagmus refers to involuntary back and forth or cyclical movements of the eyes. Taber's at 1426.

6

five seizures and passing out one time since January 2000.  (Tr. 350.)  She had been seen and evaluated in the emergency room several times and described having chest pains, headaches, aches and pain involving her cervical occipital region and shoulders.  Examination by Dr. Campbell revealed the Plaintiff was alert, oriented, and pleasant, but her affect was flat. (Tr. 351.)   Dr. Campbell stopped her prescription for Topamax and increased her Neurontin dose. (Tr. 350-351.)

On March 23, 2000, Dr. Campbell increased her Dilantin dosage to five times a day.  (Tr. 339.)  Since last seen, the Plaintiff reported two more episodes.  (Tr. 339.)  On April 6, 2000, the Plaintiff returned to Dr. Campbell.  She complained of continued aura-like activity.  (Tr. 349.) The Plaintiff denied any generalized or partial seizure activity.  She was still taking Dilantin 400 mg and Nuerontin and an occasional Xanax.  (Tr. 349.)   The Plaintiff reported being eight (8) weeks pregnant. (Tr. 349.)  Dr. Campbell discussed anti-epileptic medications and pregnancy.  (Tr. 349.)

On April 19, 2000,  Dr. John DeToledo, Associate Professor of Neurology, University of Miami examined the Plaintiff at the epilepsy clinic at the request of Dr. Campbell. (Tr. 157-158.)  The Plaintiff gave a history of altered awareness which began after a motor vehicle accident that occurred in April of 1999.   The Plaintiff's husband reported that episodes seemed to occur at night and the Plaintiff felt very tired after each episode and might sleep three to four hours.  (Tr. 157.)  She was currently taking Neurontin and Dilantin and reported feeling tired and without energy.  (Tr. 157.) Examination revealed she appeared somewhat depressed and appeared irritable at times.  (Tr. 158.) She was alert, oriented and cooperative.  (Tr. 158.)  Cranial nerves were normal and a fundoscopic exam was normal.  (Tr. 158.)  She had mild nystagmus on lateral gaze.  (Tr. 158.)  Dr. DeToledo gave a tentative diagnosis that the description of symptoms had many features suggestive of psychogenic seizures.  (Tr. 158.)  Dr. DeToledo recommended an inpatient telemetry evaluation.  (Tr.

158.)

On August 2, 2000, Dr. Harold W. Lettner, Ph.D., examined the Plaintiff upon referral for an assessment of her current emotional status and memory skills. (Tr. 150-153.)  The Plaintiff appeared well dressed and groomed. (Tr. 151.)  Her thought processes were logical and coherent with no signs of thought disorder or other psychotic symptoms.  (Tr. 151.)  Her affect was responsive. (Tr. 151.)  Her mood was marked by intense anxiety and some depression. On the BDI, the Plaintiff scored 26 which indicated the presence of moderate levels of depression[7].

The Plaintiff obtained a Verbal Memory Index Score of 66 and a Visual Memory Index Score of 91.  (Tr. 151.)  She obtained a general memory index score of 69, which fell into the impaired range.  (Tr. 151.)  Her immediate recall of verbal information and her attention and concentration skills were in the impaired range and her delayed recall was in the borderline range and below the mean.   The results of the evaluation indicated the presence of intense adjustment difficulties, characterized by severe anxiety and moderate depression, in response to her head injury. She also evidenced memory deficits, which were specific to the left cerebral hemisphere. Her emotional status contributed to the overall memory deficits, especially in terms of attention/concentration skills and her ability to make sense of things. Dr. Lettner opined that given those findings it was unlikely that she would be able to obtain gainful employment, however, she could manage her own finances.  (Tr. 151.) Dr. Letter stated she had major depression with severe anxiety, without psychotic features and

---

[7]The Plaintiff evidenced a somewhat dysphoric mood, intense anxiety, feelings of discouragement about the future, reduced pleasure in life, a sense of punishment, self disgust, a self critical attitude, crying, irritability, reduced interpersonal interest, difficulty making decisions, feeling unattractive, inability to work, sleep disturbance, fatigue, reduced appetite, weight loss, somatic preoccupation, and reduced sex drive. She was quite distractable and had significant difficulties understanding instructions. Her intense anxiety interfered with her performance, especially her ability to concentrate.  (Tr. 151.).

post concussion syndrome and seizure disorder. (Tr. 151.)

On August 7, 2000, the Plaintiff was admitted to Jackson Memorial Hospital for her telemetry evaluation. (Tr. 154-172.)  While hospitalized, on August 9, 2000, the Plaintiff was observed by staff having a grand mal seizure with her left side and left arm outside her bed.  (Tr. 164.)  She was shaking all over her body.  (Tr. 164.)  The Plaintiff was worried about further seizures and her husband stated he would remove her from the hospital unless her medications were restored. (Tr. 162.)  She was told she would be kept on Dilantin at a lower level. (Tr. 162-163.) On August 10, 2000, Dr. DeToledo stated that the Plaintiff was clinically stable and had no seizures since last evening. (Tr. 161.) The seizure from the previous evening presented as a sudden onset of low amplitude jerking motions involving all her extremities and lasted about thirty-five seconds. There were no tonic-clonic movements and she acted normal afterwards. Her EEG tracings showed no epileptic activity at any time. Dr. DeToledo opined this event was not epileptiform in nature and he would continue to reduce her medication throughout the day to further investigate the possibility of epilepsy. (Tr. 161.)

On October 3, 2000, Nurse Practitioner Eurich, dictated a letter stating that the Plaintiff was under her neurological care since April 15, 1999 for possible epilepsy, panic attacks, anxiety, and depression. (Tr. 343.) Her current diagnosis was pseudoseizures with associated panic attacks and anxiety. She was eight months pregnant and was reporting strong aura seizures. (Tr. 336.)

On October 24, 2000, Dr. Steven Smith, a psychologist, examined the Plaintiff for anxiety and panic symptoms at the request of Nurse Practitioner Eurich. (Tr. 335, 337-342.)  She was given several tests, including MMSE, a formal test to measure mental status.  The Plaintiff's performance yielded 29 out of 30 words correct with 3 of 3 words recalled after a 5 minute delay.  (Tr. 340).

9

There were no signs of cognitive dysfunction with this test.  (Tr. 340.)  The Plaintiff was also administered the Beck-Depression Inventory-II, a self-report questionnaire. (Tr. 340.) The Plaintiff's total score was 30, suggesting moderate to severe levels of depressive symptomology.  (Tr. 340.) The Taylor anxiety test showed mild to moderate symptoms of subjective anxiety and on the physical stress scale she showed a significantly elevated predisposition to psychosomatic disease.  (Tr. 341.) Dr. Smith opined that the Plaintiff appeared to suffer from a major depression, moderate, recurrent, in addition to a panic disorder without agoraphobia. (Tr. 341.)   Additional diagnoses included somatization[8] disorders.

The Plaintiff gave birth to her baby in early November 2000.  (Tr. 334.)  The Plaintiff was instructed to taper off Neurontin slowly.  She complained that she continued to have spells, even having one during delivery. (Tr. 334.) On December 19, 2000, while leaving Dr. Campbell's office, she "sat her child on the floor in a carrier, stated she had to sit down and then fell to the floor," experiencing an "unusual episode" rolling back and shaking her hands.  (Tr. 333) She seemed to have some confusion following the spell. (Tr. 333.)  Rescue was called and the Plaintiff was taken to the emergency room. (Tr. 333.)

On January 10, 2001, Dr. Campbell completed a disability statement regarding the Plaintiff's condition. (Tr. 413-414.)   Dr. Campbell stated the Plaintiff's primary diagnosis was non-epileptic seizures and her secondary diagnosis was epileptic seizures.  She was unable to drive and should avoid heights and machinery.  (Tr. 413.) There was slight difficulty in occupational functioning.  The Plaintiff became unable to work on April 1, 1999. (Tr. 414.)

---

[8]Somatization is the process of expressing a mental condition as a disturbed bodily function. Taber's at 1921.

The Plaintiff commenced treatment with Dr. Smith, a psychologist, in January 2001, complaining of continued seizure-like activity, dysphoria, difficulty managing stress, and mild interpersonal conflict. (Tr. 416.) Meanwhile, Dr. Michael Novak treated the Plaintiff for her seizure disorder from January through March 2001. (Tr. 410-412.) Dr. Novak opined that some of her history sounded suspicious for real seizures and that there might be some real epileptiform activity. Dr. Novak started her on Zonegran and she was instructed to continue on BuSpar and psychological follow up. (Tr. 411-412.) At her next visit, on March 1, 2001, the Plaintiff explained that she had three events since her last visit. Her dosage of Zonegran was increased. (Tr. 410.) Over the following months of 2001 and early 2002, the Plaintiff continued under Dr. Novak's treatment. (Tr. 401-409.) Her medications continued to be adjusted.

On January 22, 2002, Dr. Michael Novak completed a disability form regarding the Plaintiff's condition. (Tr. 402-405.) She was diagnosed with seizures and pseudoseizures. The Plaintiff was unable to drive and her activities were limited by her seizure precautions. (Tr. 405.) She had slight difficulty in occupational functioning, but generally functioned well and had some meaningful interpersonal relationships. (Tr. 405.)

According to a Psychiatric Review Technique Form dated February 26, 2004, Dr. Jerold R. Wentland, a psychologist, examined the Plaintiff for stress and anxiety. (Tr. 422-425.) She suffered from an affective disorder and suffered from extreme restrictions of daily living and marked difficulties in maintaining social functioning and in concentration, persistence, or pace. (Tr. 422.) She was further noted to suffer from a chronic organic mental disorder of at least two years' duration and had been disabled from substantial gainful activity since September 2000. (Tr. 422.) She suffered from a generalized persistent anxiety disorder with motor tension, autonomic hyperactivity, and

apprehensive expectations.  (Tr. 423.) She also had recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and a sense of impending doom occurring on the average of at least once a week and recurrent and intrusive recollections of traumatic experience, which were a source of marked distress. (Tr. 423.)  Dr. Wentland further opined that the Plaintiff had poor or no ability to relate to coworkers, deal with the public, deal with work stress or maintain attention or concentration. (Tr. 424.)   Dr. Wentland opined that the Plaintiff had poor or no ability to work at a job and understand, remember, and carry out complex, detailed or simple job instructions. In making personal or social adjustments she would be unable to work at a job and behave in an emotionally stable manner, relate predictably in social situations or demonstrate reliability. (Tr. 425.)

### *Administrative Law Judge's Decision*

Upon consideration of the record, the ALJ found that the Plaintiff met the disability requirements for a period of disability of Disability Insurance Benefits on her alleged onset disability date and was insured only through December 30, 2000.  (Tr. 23.)  The ALJ found that the Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. (Tr. 23.)  The ALJ found that between April 12, 1999 through December 31, 2000, the Plaintiff had an impairment or combination of impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. §404.1520©).  (Tr. 23.)  However, these medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (Tr. 23.)  Upon careful consideration of all the medical opinions in the record regarding the severity of the Plaintiff's impairments, the ALJ further found that between April 12, 1999 through December 30, 2000, the Plaintiff's allegations regarding her limitations were not totally credible. (Tr. 23.)  The ALJ

12

concluded that through December 31, 2000, the Plaintiff had the residual functional capacity to perform sedentary and light work. (Tr. 23.) The ALJ further concluded that the Plaintiff was to never climb ladders, avoid operating motor vehicles, moving machinery, unprotected heights and was to avoid detailed or complex work task as opposed to routine and repetitive tasks. Additionally, to the extent the Plaintiff alleges additional limitations or symptoms causing additional limitations, she is not credible. (Tr. 23.) The ALJ found that between April 12, 1999, through December 31, 2000, the Plaintiff was unable to perform any of her past relevant work, substantiated by the testimony of a vocational expert (VE). (Tr. 23.) The ALJ found that the Plaintiff is considered a "younger individual", has a high school education, and transferability of work skills was not an issue. (Tr. 24.) The ALJ determined that, although the Plaintiff is unable to perform the full range of light work, using Medical-Vocational Rule 201.18 and 202.21 of Tables Nos. 1 and 2, Appendix 2, Subpart P, Regulations No. 4 as a framework for decision-making, there are a significant number of jobs in the national economy that the Plaintiff can perform. (Tr. 24.) Therefore, between April 12, 1999 and December 31, 2000, the date the Plaintiff was last insured for benefits under Title II of the Act, the Plaintiff was found "not disabled" as defined in the Social Security Act 20 C.F.R §404.1520(g). (Tr. 24.)

## THE STANDARD OF REVIEW

### A. Affirmance

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971). In evaluating whether a claimant is disabled, the ALJ must follow the

sequential inquiry described in the regulations[9].  See 20 C.F.R. §§ 404.1520(a), 404.920(a).  The

Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. §

405(g).  Substantial evidence is more than a scintilla-*i.e.*, the evidence must do more than merely

create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable

person would accept as adequate to support the conclusion.  Foote v. Chater, 67 F.3d 1553, 1560

(11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); Richardson, 402

U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court

will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the

reviewer finds that the evidence preponderates against the Commissioner's decision.  Edwards v.

Sullivan, 937 F.2d 580, 585 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.3d 1356, 1458 (11th Cir.

1991).  The District Court must view the evidence as a whole, taking into account evidence favorable

as well as unfavorable to the decision.  Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835,

---

[9]The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability.  The steps are as follows:
    *Step 1.*  Is the claimant engaged in substantial gainful activity?  If the claimant is engaged in such activity, then he or she is not disabled.  If not, then the ALJ must move on to the next question.
    *Step 2.*  Does the claimant suffer from a severe impairment?  If not, then the claimant is not disabled.  If there is a severe impairment, the ALJ moves on to step three.
    *Step 3.*  Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, then the claimant is disabled.  If not, the next question must be resolved.
    *Step 4.*  Can the claimant perform his or her former work?  If the claimant can perform his or her past relevant work, he or she is not disabled.  If not, the ALJ must answer the last question.
    *Step 5.*  Can he or she engage in other work of the sort found in the national economy?  If so, then the claimant is not disabled.  If the claimant cannot engage in other work, then he or she is disabled.  See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

837 (11th Cir 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The court "may not decide the facts anew, reweigh the evidence or substitute it's judgment for that of the [Commissioner]."Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997).

**B.  Reversal and Remand**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).        The district court may also remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).

To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the

law relevant to the disability claim. <u>Jackson</u>, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); <u>Davis</u>, 985 F.2d at 534 (remand to the Secretary is warranted where the ALJ has failed to apply the correct legal standards). Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. <u>Falcon v. Heckler</u>, 732 F.2d 827, 830 (11th Cir. 1984). (remand was appropriate to allow ALJ to explain the his basis of his decision).

On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence upon a showing that there is new evidence which is material and that there was good cause for the failure to incorporate such evidence into the record during a prior proceeding. <u>Diorio v. Heckler</u>, 721 F.2d 726, 729 (11th Cir. 1983)(finding ALJ error and remanding to consider psychiatric evaluation); <u>Reeves v. Heckler</u>, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (remanding on the grounds that it is reversible error for the ALJ not to order a consultative examination when warranted). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. <u>Jackson</u>, 99 F.3d at1095.

In contrast, a sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. <u>Jackson</u>, 99 F.3d at 1095. Sentence six of § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405 (g) (sentence six). To remand under sentence six, the claimant must establish: (1)

that there is new, non-cumulative evidence; (2) that the evidence is material — relevant and probative

so that there is a reasonable possibility that it would change the administrative result; and (3) there

is good cause for failure to submit the evidence at the administrative level.  Jackson, 99 F.3d at 1090 -

92; Keeton v. Dept. of Health and Human Serv., 21 F.3d 1064, 1068 (11th Cir. 1994).   With a

sentence-six remand, the parties must return to the district court after remand to file modified findings

of fact. Jackson, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not

enter a final judgment until after the completion of remand proceedings.[10] Id

## DISCUSSION

The Plaintiff argues that the ALJ erred in his decision by: (1) failing to find the Plaintiff's

pseudoseizures equal to the requirements of Listing 11.02; (2) failing to consider the frequency,

severity or control of the Plaintiff's seizures when determining the Plaintiff's residual functional

capacity; and (3) improperly rejecting the opinions of Dr. Harold Lettner and Jerold Wentland and

instead affording great weight to the State Agency physician's opinions.   The Commissioner argues

that the ALJ's decision is supported by substantial evidence and therefore, should be affirmed.

*(1) Whether the ALJ Improperly Found the Plaintiff's Impairment Did Not Meet or Medically
Equal Any of the Listing Impairments Listed in Appendix 1 of the Regulations*

The Plaintiff's first argument states the ALJ erred by not analyzing the Plaintiff's

---

[10]The time for filing an application for attorneys fees under the Equal
Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under
sentence four and sentence six. Jackson, 99 F.3d at 1089, 1095 n.4 and
surrounding text. In a sentence-four remand, the EAJA application must be filed
after the entry of judgment before the district court loses jurisdiction. Id. In
a sentence-six remand, the time runs from the post-remand entry-of-judgment date
in the district court. Id.

pseudoseizures to determine if they equal in severity the criteria of Listing 11.02 as listed in 20 CFR Part 404, Subpart P. Appendix 1.   In contrast, the Defendant contends that the Plaintiff failed to meet her burden by failing to establish that her impairments met the requirements of Listing 11.02 on or before December 31, 2000, the Plaintiff's date last insured.   The Defendant further argues that the Plaintiff's alleged episodes were subjective complaints and were unsupported by the objective medical evidence.   Finally, the Defendant argues that the Plaintiff did not raise the issue with the Appeals Council, thus, the ALJ did not specifically discuss Listing 11.02.

The listings of impairments for each of the major body systems describes impairments which are considered severe enough to prevent a person from doing any gainful activity. Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002). To "meet" a Listing, a claimant must have a diagnosis included in the Listing and must provide medical reports documenting the conditions meet the specific criteria of the Listing and the duration requirement. Id. To "equal" a Listing, the medical findings must be "at least equal in severity and duration to the listed findings." Id. If a claimant has more than one impairment, and none meets or equals a listed impairment, the Commissioner reviews the impairments' symptoms, signs, and laboratory findings to determine whether the combination is medically equal to any listed impairment. Id.

The Plaintiff argues that the ALJ should have found Listing 11.02 is applicable based upon her impairments and should have analyzed and discussed it.  Listing 11.02 applies to epilepsy and reads as follows:

> Epilepsy-convulsive epilepsy, (grand mal or psychomotor, or focal) documented by detailed description of seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.  With:

    (A)     Daytime episodes (loss of consciousness and convulsive seizures) or

    (B)     Nocturnal episodes manifesting residuals which interfere significantly with activities during the day.

20 CFR Part 404, Subpart P, Appendix 1, 11.02.

At step 2 of the sequential evaluation process, the ALJ found that the evidence showed that Plaintiff has a severe combination of impairments causing significant vocationally relevant limitations as set forth in the decision and are severe within the meaning of the Regulations. (Tr. 13.) The ALJ then determined that while the Plaintiff has a severe combination of impairments, the impairments did not meet or medically equal any of the listed impairments in Appendix 1 of the Regulations. The ALJ stated as follows:

> While the Plaintiff has a severe combination of impairments, these impairments, whether considered singly or in combination, have not met or medically equaled any of the impairments listed in Appendix 1 of the Regulations (20 CFR, Part 404, Subpart P, Appendix 1). No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment. Therefore, the claimant cannot be found [disabled] on medical considerations alone. 20 CFR §404.1520(d).

Prior to making her determination that the Plaintiff did not have an impairment that meets or equals 20 CFR, Part 404, Subpart P, Appendix 1, the ALJ considered the Plaintiff's medical evidence. The ALJ reviewed the Plaintiff's treatment records and discussed the Plaintiff's impairments, including several diagnosis that the Plaintiff was experiencing pseudoseizures, under the appropriate sections and concluded that the impairments whether considered individually or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4 (20 C.F.R. §§ 404.1520(d) and 416.920(d)). (Tr. 20.) The language used by the ALJ in her decision constitutes sufficient evidence that she considered and rejected a determination that the

Plaintiff's condition medically met or equaled Listing 11.02. Johnson v. Barnhart, 148 Fed. Appx. 838, 842 (11th Cir. 2005) (citing Wilson, 284 F.3d at 1224) (holding that the ALJ's determination the medical evidence establishes that the claimant had several injuries which constitute a severe impairment, but did not have an impairment or combination of impairments that medically equaled a listing- was "evidence that [the ALJ] considered the combined effects of [claimant's impairments]"). Thus, the Plaintiff's argument that the ALJ should have specifically considered Listing 11.02 lacks merit under current Eleventh Circuit case law.

### (2) Whether the ALJ Erred in Determining the Plaintiff's RFC Regarding the Frequency, Severity and Nature of the Plaintiff's Pseudoseizures and Their Affect on Her Ability to Work

The Plaintiff bears the burden of proving she cannot meet the physical and mental demands of [her] past relevant work, either as [she] performed it in the specific past employment or as the work is generally performed in the national economy. Paige vs. Apfel, 2001 WL 936198 (S.D. Ala. 2001) (citing Jackson v. Bowen, 801 F.2d 1291, 1293). The RFC is an assessment which is based upon all the relevant evidence of a claimant's remaining ability to do work despite his impairments. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1545(a)). The determination of RFC is within the authority of the ALJ and along with the Plaintiff's age, education, and work experience the RFC is considered in determining whether the claimant can work. Lewis, 125 F.3d at1440 (citing 20 C.F.R. § 404.1520(f)). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner. 20 C.F.R. § 404.1527 (e).

The Plaintiff argues that the ALJ did not properly determine the Plaintiff's RFC because she failed to assess the nature and effect of the Plaintiff's pseudoseizures. The Defendant maintains that the ALJ's RFC determination is supported by substantial evidence because the ALJ found the Plaintiff's allegations, when compared with the objective medical evidence, were subjective and not credible. Thus, the Plaintiff's credibility was a discerning factor.

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court). The credibility determination does not need to cite "particular phrases or formulations" but it cannot merely be a broad rejection which is "not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole." Dyer v. Barnhart, 395 F. 3d 1206, 1210 (11th Cir. 2005).

Social Security Ruling 96-7p sets forth that the Regulation requires a two-step process for evaluating subjective symptoms: First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment or impairments established by medically acceptable clinical and laboratory diagnostic techniques which could reasonably be expected to produce the individual's symptoms. Second, if such underlying physical or mental impairment or impairments have been found, the ALJ must evaluate the intensity, persistence, and limiting effects

of the individual's symptoms to determine the extend to which the symptoms limit the individuals' ability to do basic work activities. <u>Beech vs. Apfel</u>, 100 F.Supp.2d 1323, 1332 (S.D. Ala. 2000). To do so, the ALJ must make a finding in regard to the credibility of the individual's testimony and statements based upon his evaluation for the entire case record. <u>Id</u>. Any allegation of diminishment of the Plaintiff's capacity for basic work activities must be supported by the objective medical evidence and other evidence in the case record. Social Security Ruling 96-7p; <u>Beech</u>, 100 F.Supp.2d at 1332.

The Plaintiff testified that she cannot remember what happens during a seizure or panic attack and sometimes feels disoriented afterward for anywhere between a few minutes to an hour. (Tr. 437, 445-446.) She also states that she doesn't feel like herself afterwards. (Tr. 438.) She states she has trouble remembering things and can't help her daughter with school. (Tr. 438.) She testifies that her husband handles making the decisions for the family. (Tr. 438.) Since the alleged onset dates of disability, the Plaintiff states that she began to have trouble with seizures and headaches and she reported seeing her physicians once a week. (Tr. 443.) She was treated with medication and has not driven since that date. (Tr. 443.) She testified that she experiences panic attacks when around a lot of people and noise. (Tr. 447.)

In determining the Plaintiff's RFC, the ALJ evaluated the Plaintiff's credibility and states:

The Administrative Law Judge finds the claimant's statements concerning her impairments and their impact on her ability to work not entirely credible in light of discrepancies between the claimant's assertions and information contained in the documentary reports as described below. In fact, the Administrative Law Judge finds that the claimant has not provided evidence which establishes her condition was disabling on or before December 31, 2000, her date last insured. (Tr. 20.)

While the claimant has a long history of alleged fainting or falling out spells, the Administrative Law Judge must confine this determination to the period April 12,

22

1999 through December 31, 2000 regardless of the severity of impairment that developed subsequently. The evidence does reveal that while driving to work in April 1999, the claimant had a syncopal episode. Subsequent to this she developed episodes she described as a sensation like she was on a roller coaster and then blacking out. She was given a diagnosis of seizure disorder and started on Dilantin. However, extensive work-up including computerized tomography scans, magnetic resonance imaging scans and EEG's were all normal. Physical examinations during the period in question revealed no nystagmus, coordination adequate on finger-to-nose testing, negative Romberg's steady gait, no speech problems and adequate balance. A video/EEG in April 2000 was interpreted as not epilepsy . Thereafter, her anticonvulsant medication were tapered despite claimant's complaints of seizure activity. The claimant did have a spell in her doctor's office in December 2000 and was transported to the hospital . This physician felt the claimant should be admitted to the hospital, as he felt there were a number of issues that needed to be resolved but, the claimant left the hospital emergency room against medical advice. The Administrative Law Judge notes if the claimant's alleged spells were as serious as alleged she certainly would have taken her physician's advice to be admitted to the hospital. (Tr. 20-21.)

The ALJ also found that the Plaintiff's credibility was further undermined by her demeanor at the hearing stating that she claimed to be weak, hearing voices and crying. However, as the hearing progressed, she became attentive, responsive, and appeared just fine. (Tr. 21.)

First, the ALJ noted the Plaintiff's history of syncopal episodes and diagnosis of seizure disorder. The ALJ found that the clinical and laboratory findings of record contradicted the Plaintiff's claim of a disabling impairment. (Tr. 20.) However, the ALJ only considered the lack of physical explanations regarding the Plaintiff's impairment and did not delve into the mental aspect that can create pseudoseizures. The ALJ did not make a finding regarding the frequency and severity of the Plaintiff's pseudoseizures and how that might affect her RFC. Beech, 100 F.Supp.2d at 1332 (holding that the ALJ must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extend to which the symptoms limit the individuals' ability to do basic work activities). Thus, the record must be developed in regard to the Plaintiff's pseudoseizures, including

23

the frequency and severity with which they occurred prior to the Plaintiff's last date insured on December 31, 2000, and whether or not that effected the Plaintiff's ability to perform work.

### (3) Whether The ALJ Properly Discounted the Opinions of Dr.'s Harold Lettner and Jerold Wentland

The Plaintiff's final argument is that the ALJ improperly discounted the opinions of Dr. Harold Lettner, a consulting neuropsychologist, and Jerold Wentland, an examining psychologist. Further, the Plaintiff objects to the ALJ's assessment and the weight given to the State Agency Medical Consultant's opinions.

The ALJ is required to review all of the medical findings and other evidence that supports a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527 (e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner. 20 C.F.R. § 404.1527 (e).

The Plaintiff argues that the ALJ did not accord the proper weight to the opinions of Dr. Harold Lettner, a consulting neuropsychologist and Jerold Wentland.  The ALJ rejected Dr. Lettner's findings which stated the Plaintiff was unable to obtain gainful employment due to memory deficits especially in terms of attention/concentration skills and her ability to make sense of things.  (Tr. 21, 152.)  Dr. Lettner further opined that the Plaintiff suffered from Major Depression, with severe anxiety, in response to her head injury as a result of the motor vehicle accident. (Tr. 152.)  However,

24

the ALJ determined that Dr. Lettner's opinion was not supported by the record as a whole. (Tr. 21.)

In her decision, the ALJ states:

The Administrative Law Judge has considered the report of Harold W. Lettner, Ph.D., set forth in Exhibit 2F stating it was unlikely the claimant would be able to obtain gainful employment due to memory deficits especially in terms of attention/concentration skills and her ability to make sense of things. On the other hand, however, this physician stated the claimant was able to take care of her own finances. Although the claimant did report a motor vehicle accident on April 12, 1999 and hitting her car against a tree she apparently did not seek any care following this accident. She was seen in a hospital emergency room on April 10, 1999, after apparently having a seizure in church on that day and during this emergency room treatment she reported crashing her car but no one was hurt. The undersigned therefore rejects this physician's opinion as vague and unsupported by substantial evidence. (Tr. 21.)

With regard to the ALJ's assessment of Harold Lettner, the Court finds the ALJ's reasoning unclear. As support for rejecting Dr. Lettner's opinion, the ALJ points to the Plaintiff's capability of taking care of her own finances. (Tr. 152.) However, the ALJ does not provide further evidence to support discounting this opinion. The ALJ references the Plaintiff's motor vehicle accident, however, it is unclear as to how this substantiates the ALJ's finding that Dr. Lettner's opinion was vague and unsupported by substantial evidence. The ALJ did not specify how this examining physician's assessment either was in agreement or in contrast with the Plaintiff's treating physicians. The ALJ failed to explain with any specificity the weight, if any, given to the Plaintiff's treating sources or why the examining source was rejected. Thus, the Court finds that the ALJ did not provide good cause for discounting the opinion of the examining physician, Dr. Lettner.

The ALJ goes on to address Dr. Harold Wentland's opinion which indicated that the Plaintiff was disabled from substantial gainful activity since at least September 1, 2000, due to depressive syndrome characterized by loss of interest in almost all activities, appetite and sleep disturbance,

25

psychomotor agitation, decreased energy, difficulty concentrating, and audio hallucinations.  (Tr.

422.)   He further opined that the Plaintiff was extremely limited in activities of daily living, and

markedly limited in maintaining social functioning, concentration, persistence or pace.  (Tr. 422.)

There was insufficient evidence, however, of repeated episodes of decompensation.  (Tr. 422.)   The

ALJ found that Dr. Wentland's opinion was not supported by the medical record.   The ALJ stated

as follows:

> The Administrative Law Judge also rejects the opinion of Jerold R. Wentland, Ph.D.,
> dated February 26, 2004, set forth in Exhibit 18F.  The undersigned notes there are
> no intervening office visit notes from this physician prior to November 2003 that
> could support his statement dated February 26, 2004 that the claimant was totally
> disabled and unable to be gainfully employed.  The undersigned notes when seen for
> psychological evaluation in October 2000 (Exhibit 9F), the claimant reported her
> memory was "okay" and she reported no difficulty in remembering the names of
> family members or friends.  She also indicated during this evaluation she had [no]
> difficulty with missing important appointments or misplacing important items.  Thus,
> the undersigned cannot give much weight to Dr. Wentland's opinion, particularly in
> the face of the medical evidence prior to that time.  (Tr. 21.)

Here, the ALJ rejects the opinion of Jerold R. Wentland, Ph.D., as outlined in a Psychiatric

Review Technique Form. (Tr. 422).  As noted by the ALJ, Dr. Wentland completed this assessment

on February 26, 2004, some time after the Plaintiff's date last insured.  (Tr. 422).  The ALJ rejected

Dr. Wentland's statement that the Plaintiff was disabled as of September 1, 2000, based upon the

absence of any medical records from him prior to November 2003.   In support of her findings, the

ALJ points to a psychological examination where the Plaintiff stated her memory was "okay".  (Tr.

341).  The ALJ concludes that little weight was given because the medical evidence prior to the

Plaintiff's date last insured does not support his assessment.  Although the ALJ did not state how

much weight was given to the treating physicians, the Court agrees that Dr. Wentland opinion is

entitled little weight because it was issued outside of the Plaintiff insured status.

While the ALJ states that she considered the opinions of the state agency consulting physicians to be in line with the medical evidence of the case prior to December 31, 2000, she does not specify what medical evidence it is that substantiates the opinions of the consulting physicians.

In assessing the medical evidence, the ALJ [is] required to state with particularity the weight given the different medical opinions and the reasons therefor. " McNamee v. Social Security Administration, 164 Fed.Appx. 919, 923 (C.A. 11 2006) (*citing* Sharfarz v. Bowen, 825 F.2d. 278, 279 (11th Cir. 1987).   Given the shortcomings in the ALJ's order, as well as its ambiguous nature, the Court finds that it is appropriate to remand this case to the Secretary for further consideration as outlined below.

Accordingly it is hereby **RECOMMENDED:**

The decision of the Administrative Law Judge should be **REMANDED** for

(1) Consideration of the frequency and severity of the Plaintiff's pseudoseizures and the effect they would have on the Plaintiff's RFC.

(2) Further consideration of the treating and non-treating physicians opinions.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**DONE AND ORDERED** at Fort Myers, Florida, this ___12th___ day of September, 2005.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: Counsel of Record